With the lawyers who are going to argue the case, please approach the bench and introduce yourselves. Good morning, Justices. I'm John Young, a contract attorney for the State Appellate Defender. Good morning. And I'm Assistant State's Attorney Brian Hodes on behalf of the people. Do you want to reserve some time for rebuttal? Three minutes, please. Okay. Let's proceed. Good morning, Justices. Good morning. Mr. Young, how is this not a Terry stop? Let's get right to it. How is it not a Terry stop? How is this not a Terry stop? It is a Terry stop. Okay. So if it's a Terry stop, then the officers were justified in going and questioning Mr. Villegas, weren't they? Well, they have to have reasonable, articulable suspicions. And I believe the officer stated what the basis of his suspicion was. Why is that not adequate? Well, the supporting case law in the brief shows that the totality of the facts don't rise to that level of reasonable, articulable suspicion that there was criminal activity. He was sitting at a bus stop. He had a sealed beer in a plastic bag that he had purchased, and he moved it back. But it's not a question of what's in it. It's what the officer believed at the time he saw Mr. Villegas. And as soon as he saw Mr. Villegas and made eye contact with him, Mr. Villegas tried to secrete the bag behind him. How is that not reasonable, articulable suspicion that something is afoot? At 2.30 in the morning on Pulaski. I don't think the time or the location is relevant to what's reasonable. Is that a high crime area? I personally am not aware that's a high crime area. There was no evidence presented at the trial. But the trial judge seemed to consider that as a factor. In fact, when he denied the motion to suppress, he indicated, well, you know, this happened at 26th and Pulaski, as if that was a significant factor in the trial judge's decision. I don't believe that those facts are reasonable and are facts that lead to a reasonable, articulable suspicion of criminal activity. They saw somebody sitting at a bus stop. The person moved a bag. They subjectively interpreted that as concealment or attempt to conceal, another officer had stated. But that's a subjective interpretation. It is a subjective interpretation. But we have a 19-year officer and an 8-year officer and a trial judge who's been on the bench 30 years, right? So the two officers, don't they have the ability to discern suspicious activity after 20 years on the job? Yeah, they can discern suspicious activity if they see activity that's suspicious. And him secreting a bag behind them as soon as he saw an officer is not suspicious? Well, he moved the bag. They subjectively described it as concealment. In fact, the partner described it as an attempt to conceal. I'm not sure what an attempt to conceal would be. So you have conflicting testimony there already. You have two officers, one claiming concealment, one claiming an attempt to conceal. I don't believe that those characterizations are objective. What's objective is what's viewable. What's viewable is you have somebody sitting at a bus stop, moved a bag. It's similar to the cases that I cited in support of. Going back to the location where this took place. So you're saying that it doesn't make a difference if it's 26th and Pulaski or if it's Michigan Avenue and Randolph. If you're at a bus stop at 215 in the morning, 213 in the morning, does that make a difference?  In fact, I don't believe that there was any testimony that that was a high crime area. I don't dispute that in making a ruling that the judge stated that or made reference to that. But there was no evidence in the record that that is a high crime area. I'm personally not familiar with that area. Don't know whether that's a high crime area. That couldn't be a factor if it was evidence that was presented in the trial. But I don't believe that that alone and the evidence that existed rise to the level of reasonable articulable suspicion. Just like the Sims case that I cite and the FJ case that I cite. They're similar to those cases. All right. Well, what do we do with the fact that your client just volunteered a statement? Well, he volunteered a statement after he was approached illegally. So anything that any fruit of the poisonous tree that happens during that encounter should be suppressed. I don't deny that he voluntarily stated that he had a gun, but he stated that during an encounter that was illegal from its inception. But the officers observed the bag. They thought it was suspicious. They inquired about the bag. So why then is that a legal stop? I mean, they had a reasonable articulable suspicion with regards to the black bag. I don't believe they did. That's no different than the Sims case where the officer saw somebody stuff something into their pants or the FJ case where an officer saw somebody stuff something into their pants. But those officers actually approached and patted somebody down. Here we have even less of an intrusion on them where they just went up and talked to them. How is this not just community caretaking, just asking them what's going on? The officers are allowed to approach somebody and ask questions. We don't always implicate the Fourth Amendment every time there's a police citizen encounter. I agree. But the trial court found that this was a Terry stop, found that it wasn't a field interview. And the officers testified that based on their hunches and their suspicions and their experience that they believed that he had contraband in his bag, and he didn't. Okay. But the trial court found that the initial approach with regards to the bag was a Terry stop. Right. But he did find that the second statement where they asked him, do you have a weapon, was just a consensual encounter. Did he not? I don't believe that that was a ruling of law, that that created two separate encounters. That we had a Terry stop that ended when the sealed beer was found in the bag and now we have a field interview after that point. The two cases you cited, though, the officers in those cases patted the individual down. Correct? Sure. They patted him down initially as well. I think that's important. Does that take this case out of it? The officers here didn't have their weapons on holder. They never touched the defendant. They were merely talking to him. So does that change the level of encounter? No, I don't think it does. The officers obviously believed that this was not a situation where they were being threatened because when they approached Villegas initially, they didn't pat him down. They didn't ask about the weapons. It was only after they had struck out on their Terry stop, or illegal Terry stop, that there was contraband in his bag that they then asked whether he had a weapon. And then he, of course, voluntarily stated that he did. All right. Getting back to you, and I hate to keep harping on this issue, but it seems that the location of the stop was significant. And it was significant in the trial judge's mind. I mean, he specifically said the issue is at 2.13 in the morning at Pulaski and approximately 26th Street. Do they have a right to ask about weapons under these circumstances that bind that there was an initial Terry stop and that it was not a custodial interrogation? And then based on that, he denies. So is the location significant here or not? Well, first there was no evidence that it's a high crime area. That was, I guess he took judicial notice of that. I don't believe adding that fact to the facts, not the suspicions and the hunches, but the facts that existed in this case do not rise to the level of reasonable articulable suspicion that there was criminal activity. I've supported the position with several cases, the Sims case, which I mentioned. Let me ask you this. If somebody's trying to hide a bag and the police see them when they make eye contact, is that any different than somebody running away? Let's say he's sitting there and he sees a police car and he gets up and he starts to run away. Does that give a policeman a suspicion? Well, flight is certainly a suspicion based on the Ward Law case that was cited, I believe, in the Abilese brief. How is it any different than somebody trying to hide a bag? Well, hide is subjective here. I mean, we know he moved a bag. One officer said he attempted to conceal a bag, and the other officer said he tried to conceal a bag. We don't really have any evidence of what his movement was. How did they get from this subjective statement of concealment? They thought he was trying to hide something, I guess. Well, sure, they have to have a basis. They have to have some basis to go up and stop him. So, of course, they have to testify that they thought he was concealing something. I guess the police officer, after many years and knowing the neighborhood, has, as we call it, a nose for it. FJ doesn't allow that. That's the exact fact pattern in the FJ case, and it was also an unlawful use of weapons case. They were in a high-crime area, and they saw somebody put something in his pants, concealing. It's nearly the exact same fact pattern, and the court found that that was an improper Terry stop. Let me ask you this. So the officer testifying in court, the one officer testifying to that, he had a reasonable, articulable suspicion that there was something in the bag in terms of alcohol. Right. So now, let's say, you know, the client hands over the bag. Turns out it's not alcohol, but it's a handgun. I don't think what's inside makes any difference. They have to have facts that lead to the initial confrontation with the defendant. What happened after the fact, discovery of what's in the bag, I don't think is relevant. So what we need to have here is specific facts which would lead to this being a proper stop and a Terry stop. Right. We have to have reasonable, articulable facts that lead to them approaching him at the beginning. In the FJ, let's go back to that for a minute. When the officers see him shove something in his pants, if the officers approached him and said, do you have a weapon? And he said, yeah, I have a gun. Here it is. Would your argument be the same that it is today, that the officers didn't have a basis to approach him? Yes. And that evidence would also be excluded under your theory? Yes. So there is no such thing as consensual encounter between the police and a citizen? I think there is. Well, that's what I just said to you. Well, no, if the officer comes up and says, may I speak to you about something? Counsel. The officer approaches FJ, doesn't unholster his weapon, doesn't surround him with other officers, merely says, what do you have in your pants? And he says, a gun, and he hands it to him. How is that a violation of the Fourth Amendment? The FJ case found that it was a violation of the Fourth Amendment. No, the FJ case found that they came up and patted him down, and that was where the violation was. It's different when you ask them a question and somebody responds to your question. You don't have the physical intrusion of the person. Do you see a difference there? There is a difference there. Okay. But the initiation of the contact has to be based on reasonable suspicion of criminal activity. That's what's missing here. Okay. So, again, we're back to no consensual encounter between the police and the citizen? I'm not advocating that. Okay. I'm advocating that this set of facts, of which the trial court found this to be a Terry stop, was an improper Terry stop. Okay. If the Terry stop is proper, then we had an arrest based on an admission of a gun and the finding of a gun. That was not based on probable cause. Mr. Villegas was handcuffed and taken to the station before it was determined whether he had a FOID card or a concealed carry license. And Illinois law is clear that possessing a handgun, if you have a proper FOID card and concealed carry license, is legal. So Mr. Villegas was arrested without probable cause and taken to the station before it was determined that he was conducting illegal activity. I also mentioned the Sixth Amendment Confrontation Clause violation. If the court has any questions about that, I can address that issue as well. If not, I'll answer any other questions you have. Otherwise, I would ask that Mr. Villegas' conviction be reversed. Thank you. Thank you. Good afternoon. Brian Hodes on behalf of the people. Assistant State Attorney Brian Hodes on behalf of the people. So does it make a difference where the stop took place? Yes, it does. It always does. Okay. Because it's based on the totality of the circumstances, and the totality of the circumstances necessarily include the what, where, when, and how. And the trial court was acutely aware of the what, where, when, and how. And the officer's testimony was based on the what, where, when, and how, which was that time of the early morning in a particular part of town where, as Your Honor mentioned, the one officer had, well, they both had experience,  and as you put it, a nose for what was going on there. Well, let me interrupt you about this nose business. So we have a gentleman who's peacefully sitting in a bus stop, in fact, a bus shelter, waiting for the bus to arrive. These officers see a black bag. They ask about the black bag. He tenders it over. They find alcohol that's sealed. All right. End of story. Why inquire into whether or not he has a weapon? I mean, he didn't make any movement one way or another that dictated that he might have been hiding something else. He didn't try to flee. There were no bulges determined. There was no criminal activity prior to this fact. There was no report that the officers were aware of any criminal activity taking place at the time. There was no criminal activity taking place at the present time when they stopped the gentleman. So where is the totality of the circumstances for them to say, okay, now, do you have a weapon? Other than it's 26th Street and Pulaski, and they're stopping a Latino gentleman who happens to be waiting for a bus stop. They didn't say anything about his ethnicity. It's obvious, I think, from his name. Right. But I will point out that it also was 1 or 2.15 a.m., which is probably reasonable, and that he had, in the earlier testimony, been secreting, according to secreting the bag, that is. Oh, okay. So he was not exactly well. He was forthcoming when they came up and asked him to show them the bag, and he said, yeah, it contains alcohol, which confirmed their prior suspicions. It actually was covered alcohol, so it was not illegal. But that's the problem I have here. So now you can find out that there is no illegal activity with the alcohol being sealed in a bag. All right? So how do you jump from that, once you made a determination that no laws have been violated, to go to the next step? The next step is what is just a fair question to ask based on officer safety concerns, as the trial court stated, based on the time and place. What did he do to make the officers feel that they were in fear for their life or their safety? What did he do? I think it wasn't just based on what he did. I think it was based on where they were and the fact that these are police officers, and when they do a search on someone, they're going to have to turn around and walk away. And it is minimally invasive to simply ask someone, do you have a weapon? And if the person has a weapon, they're in big trouble when they turn around, even if there's two of them and one of him. So there is no invasion in asking, and it is proper under case law to ask. But where is the articulable reasonable suspicion to ask about a weapon? Under Terry and its progeny, it is proper for purposes of officer safety. They don't need an independent suspicion to ask that question. The Terry stop is ongoing, I want to make that clear, and that was something that we got wrong in our brief. And I apologize, and I did tell counsel about that before, and that's probably why he didn't point it out during his argument. Okay, so how is it ongoing? Well, it's ongoing in the sense that they've completed the part of the Terry stop where they've finished determining about the bag, which was based on reasonable suspicion. And you've taken me past that now, and you're asking me about why they have the right to ask that question. But the Terry stop isn't over, at least the encounter based on the Terry stop isn't over, because they're standing there, he's standing there, and they have to walk away now. And at that point, they're allowed to, based on concerns of officer safety, and the trial court made this as a finding. And this finding, I would think, would be subject to considerable deference. Based on officer safety, it's 145 or whatever time it is in the morning. 213. 213 in the morning. They can ask a simple question, they can ask anyone a question, do you have a weapon? But what happened to cause them to feel that they needed to ask, do you have a weapon? Officer safety. That is a fair question to ask anyone under those circumstances. Would your position be different if the officers patted him down after they saw that the bag contained sealed alcohol? Or would you, would your position still be that that's all part of this Terry stop? Well, the court said that that would have been okay, that they could have done that. So I don't know under these facts whether that would be my position, but I certainly think that this is something that is minimally intrusive, and this is the absolute minimum intrusion. We have an entire, how long was this entire encounter? I think that there was testimony, and that's all we have is testimony, there's no plots or objective evidence, that it was 10 seconds. So this is, when you think about whether something prolongs the stop, and that's usually what they talk about when it's questions and things asked to someone who's been stopped, or whether you've prolonged the stop by doing something, like a dog sniff, I think, in some of the cases, things like that, this didn't prolong it at all. They asked him, do you have a weapon? That was it. So the whole encounter was half a minute long? Probably less, according to the testimony. Okay. So would that be an important fact for the degree of intrusiveness? Yes. The degree of intrusiveness was truly minimal for the whole thing. There was no, not like the cases that, as Your Honor distinguished them, there was no pat-down until the defendant said, I have volunteered that he have the gun, and the officer then secured the gun, took the gun, found a loaded 9-millimeter gun, secured it, and at that point they arrested the defendant. Let's assume a person is just sitting at a CTA stop, and it's 2 o'clock in the morning, and the police come over and they ask him whether he has a gun, and the same thing happens. Do you need the Terry stop? I think the police are allowed to just ask someone a question, but, so I think that would be okay. But this was a Terry stop in that they'd said they'd already, they said that he wasn't free to leave at that moment, and that's why I'm defending it as a Terry stop. So the Terry stop was ongoing. But if he was just standing there and they just happened to be walking down the street and asking a question, he would also be free not to answer it, I might add. He didn't have to answer that question that way. So that would be a valid encounter. Yeah, but it wouldn't be a Terry stop, and this was a Terry stop. So that's why I've been defending it that way. So if we found that this was not a valid Terry stop, we could still find that it was a valid encounter. Is that what you're telling us? I think that there, I think the Terry stop was the first thing, so I'm not really sure how that would work. So you can't convert it to a consensual encounter once you? Yeah, I don't think that works. I agree, yeah. I'd have to think about that. I apologize. I hadn't really wrapped my mind around that kind of time switch, and I don't want to say something, but that's my inclination. I apologize. Next. I have a question about the 10-second conversation that took place between the defendant and the police officer. Yes. At the trial, the defendant needed an interpreter, and also I think the record reflects that this is a gentleman that didn't even finish high school. I think he maybe got past, you know, first year in high school. But the fact that he needed an interpreter at trial, yet there's no evidence that the officers that questioned the defendant spoke Spanish, or that there was any indication that the defendant understood English, because given the fact that, you know, he needed an interpreter at trial. So how did this conversation take place between the defendant and the police officers? Well, there is no testimony that they spoke to him in Spanish. One of the officers has a – he's named Officer Sanchez. You can infer from that what you will. The defendant answered questions, and they quoted his answers in the testimony. So apparently he understood whatever they were asking him, because his responses made sense. So beyond that, I don't really know how to respond to what you're saying. I mean, he did have an interpreter. That's true. That's all I can draw from that. What are we supposed to draw from it? I really don't know. It's not something that I'd be – I have – Was that ever asserted in the trial court by the defendant, that he didn't understand what the officers were saying? Never. He didn't testify, and there was no – that wasn't something that was argued either. I mean, I really – that wasn't the argument here made by the defense counsel, that, you know, that he was – they argued that the officers – and this, I guess, goes into the second argument, which I do need to address because they have very briefly touched on it, which was the defense counsel's argument the whole time was that the officers weren't telling the truth and that the defendant didn't possess the gun in the first place. That was the argument. There was no – he didn't contest this issue, and it was clear from the outset that that was the defendant's counsel's strategy. In our discovery responses, we said, we're going to put in a certificate or some sort of indicia saying that he doesn't have the right to own the gun, he doesn't have a void cover or a CCO. That was the argument in the opening, and then when the second officer testified, Officer Sanchez, I believe, the defendant's counsel asked leading questions on the redirect. Did you – you know, basically eliciting that he didn't have a CCL or a void card, and when he found out the defendant's name and things like that after the defendant had been arrested. Right after that, we arrested – we were going to arrest our case, but before we arrested our case, the judge said, hey, you know, I want a sidebar for scheduling. At that moment, right after that, we moved to – we introduced this evidence, and that was it. Our position is that that whole framed evidence is a strategy, and that that strategy amounted to an acquiescence on their part to admit the – to concede this issue. Acquiesce to the issue. Which issue? The – to acquiesce to the admission of the certification of the employee from the Illinois State Police that the defendant didn't have. Oh. The second – in other words, issue number two, which counsel has briefly touched on it, and therefore I'm responding to it now. Did the – did the State ever present any evidence that this was a high-crime area? We did not present evidence to that fact, but we talked about the fact that the officer was – the one officer who had the most experience, Officer Pruver, I think he had – you know, he's like a 20-year officer, and he spent almost all of it there, and he said that based on my experience, I was very suspicious of the bag, and the way that the defendant, when he looked at me in the eye, as Your Honor said, he moved to secrete the bag when we were driving by. So we stopped, and then as we got out of the car and walked towards him, he then further moved to secrete the bag. Does that indicate that it's a high-crime area? No, no, no. But I'm just saying he was suspicious about the bag. I mean, his suspicions weren't that this was like that kind of a crime that you're talking about, I think. His suspicions had to do – I mean, we're not talking about a violent crime here. We're talking about that he had an open container of alcohol, which is a different sort of suspicion. His suspicion was, based on where he was and when he was, that that's what the crime was. I mean, that wouldn't show up in – Carrying an open container of alcohol, based on the hypothesis. So the crime was that the man was waiting for a bus at a bus stop at 2 o'clock in the morning? That was the crime? With an open container of alcohol. It wasn't open. It was sealed. I'm sorry. Go ahead. The suspicion was that it was open because – Right, and then when they discovered that it was sealed, then what's the crime? There wasn't one. There wasn't one. So then the officers walk away, but before they walk away, as a matter of safety, given the circumstances, they properly, for officer safety concerns, ask the defendant simply, do you have a weapon? See, that's my problem. My problem is that there's no evidence that this is a high crime area, right? Even though they say there's safety and the judge jumps to this, it's a 26th of Pulaski, and therefore, you know, it was okay to ask about weapons. But there's no connection there. But it's all of these things. It's not just the area. It's the defendant's behavior. He's been secretive towards them. It's this time of night. It's the fact that they're police officers, and their concern, frankly, in Chicago, with walking away from someone and turning their back without first ascertaining that the person doesn't have a weapon. I think that it's a fair question to ask anywhere in Chicago for police officers, and the case law is that in Terry Stops, officer safety is such a concern that the minimal, that it's actually proper to even pat someone down for officer safety. And this is the absolute minimum. They asked. They didn't even walk a dog by, which would take more seconds than it would to say, do you have a weapon? It is a question that in and of itself would have been okay if there wasn't a Terry Stop. So they don't need it to be a high crime area to justify the question. The question is proper based on officer safety, and the trial court made the proper decision in that. And that, I don't think that that needs to be, those two things don't need to connect for that question to be proper. Well, could we take judicial notice that all areas in Chicago are high crime areas? I think that maybe at that time of night, I think you could almost say that. Officers completing Terry Stops that are entitled to be worried enough to ask that question under any and all circumstances, at any time at night of anyone, I don't care who they are and what they're dressed like, that's a fair question to ask. They should ask that question. I hope I'm not going too far on saying that. Yeah, but the question then becomes if this is an illegal Terry Stop, is the encounter also illegal? Well, if the Terry Stop is illegal, that's something else because the whole thing stems from that. But I'm saying if the Terry Stop, my argument is based on, is premised on the fact that the Terry Stop was okay because the officers had reasonable suspicion based on the way the defendant was acting with respect to the suspicious, his suspicious actions with respect to the black bag, the black plastic bag, and when the officers approached him, when they saw him. And it's true, those suspicions weren't borne out, but they don't, they were kind of borne out actually. I mean, he did have alcohol. It just didn't happen to be open. And those black bags are, I guess, the kind of bags that people generally, when you buy alcohol, you get it in a black plastic bag is my understanding. So, and that officer had a special expertise in that area at that time and that place. So they had reasonable suspicion to conduct a Terry Stop. And then when they left, as a matter of officer safety, they asked a proper question. So I do want to talk about the one case that they, that counsel has. I think you're almost past your time. If you. Go ahead. Sure. Thank you, Your Honor. I'm sorry for being so long-winded. The FJ case is different because, first of all, they did pat the person down. And that's far more invasive than what we're talking about here, as Your Honor noted. The FJ case also differs because, and this was something that was stressed in the FJ case, they found, and it was a Terry Stop case. In FJ, the court noted that the flaw may have actually been that when the person, first of all, it was a case where the person stopped someone in a crime area, but there was no link between the defendant and the crime area and the reason that they made the stop. They just sort of stopped him because he was there. And the court didn't like that. And the court also didn't like the fact that there was no link between why the minor's defendant, the minor, the minor was a minor, obviously, but the case was FJ, seemingly innocuous defendant would cause an officer to have a reasonable suspicion. And the court was attentive to the fact that it was perhaps an officer with a trained eye might see that behavior as being suspicious, but that there wasn't sufficient testimony elicited demonstrating that it was. No one had really threaded the needle on that. And I think we did thread the needle here. The officer explained why it was suspicious, what the defendant had done that was suspicious, and that testimony wasn't elicited here. So for that reason also, FJ is distinct. So you've got the testimony that threads the needle in this case, and you've got the fact that in FJ, the invasion was they patted him down. Here, you know, all they did was they very quickly, they approached him in a very, very non-confrontational, non-dangerous way, and they just asked him to look in the back. That's all they did. So for these reasons and the reasons elaborated in our brief, people, I respectfully request that this court affirm defendant's conviction. Thank you so much for your patience. The totality of the circumstances also includes the sequence of the totality of the circumstances. If this is a high-crime area, if the officers are concerned for their safety, why aren't they patting him down when they approach him initially? Why are they not asking whether he has a handgun initially if that's the concern? Officer safety is not the concern here. The Terry stop is basically over at that point, at the point where they've checked the bag. The bag has a sealed beer. It's legal to possess a sealed beer. The reason for the stop is over. If they were concerned about safety, they would have addressed that issue at the point of the initial encounter with the defendant. The totality of the evidence did not include any evidence that this was a high-crime area. Also, there was some discussion about the length of the encounter. It's not even plausible that this entire thing would have happened in 10 seconds. There was evidence that this encounter happened in under a minute, and that seems like a more reasonable time. Other than that, if you have any other questions, I would just stand on my argument. Thank you. We want to thank you for giving us a very interesting case. It was a great show. Well done. The arguments were well done, and we'll take the case under advisement.